# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 6:12-0046 |
| VERSUS | * | JUDGE HAIK |
| TYLERTON JAMES CLEMENT | * | MAGISTRATE JUDGE HILL |

## REPORT  AND RECOMMENDATION

Before the Court is a Motion to Suppress filed by the defendant, Tylerton James Clement ("Clement").  [rec. doc. 32].  An evidentiary hearing was held on the motion. Based on the evidence adduced at the hearing and the applicable jurisprudence, it is **RECOMMENDED** that the motion to suppress be **DENIED.**

## BACKGROUND

The defendant, Tylerton James Clement, was indicted on two counts of production of child pornography in violation of 18 U.S.C. § 2251(a).  The charges stem from a video which depicts the defendant and two other males sexually assaulting two 13 year-old girls, found on the defendant's cell phone after the defendant was arrested on September 19, 2011.

### *Summary of Facts and Testimony*

In January 2011, Louisiana State Police Sergeant Robert Guilbeau ("Guilbeau"), a narcotics supervisor, received information from multiple informants that narcotics (promethazine syrup and hydroponic marijuana) was being transported by Fed-Ex and United States mail from California and Michigan to Crowley, Louisiana.  Accordingly, in

early 2011, Guilbeau contacted Detective Bart Habetz ("Habetz"), a narcotics officer with the Crowley Police Department, and provided him with this information. Guilbeau asked Habetz to talk to the Postmaster in Crowley to advise him of the situation, which Habetz did. Indeed, Habetz testified that prior to September 19, 2011, he had received information from the Postmaster in Crowley about suspicious packages coming from California. Guilbeau further testified that in April 2011, a package containing narcotics (promethazine syrup), delivered to Crowley by Fed-Ex, was seized. According to Guilbeau, Habetz was aware of that seizure.

At the hearing, Habetz testified that on the morning of September 19, 2011, the Postmaster in Crowley advised Habetz that he had received numerous calls from a "suspicious person" inquiring about the arrival of a package coming from California. Habetz set up surveillance outside the post office. While conducting the surveillance, Habetz received a telephone call from the Postmaster who advised Habetz that a black male, wearing red shorts and a blue shirt, had retrieved the subject package. Habetz then witnessed a black male, wearing red shorts and a blue shirt, leave the post office, carrying a package, enter a maroon colored vehicle driven by another young black male. Habetz followed the vehicle after the two men left the post office and witnessed the driver twice fail to fully stop at a stop sign.

When Habetz attempted to pull the vehicle over for the traffic violation, the car pulled over and then sped away; a pursuit ensued. Habetz radioed for assistance,

describing the vehicle and giving the license plate number.  Eventually, the vehicle stopped and the two occupants fled on foot with the package.  Habetz radioed the location of the fleeing suspects and their descriptions. The police dispatch log corroborates this testimony.  The log shows at 9:50:25 a.m.: "9th and b running package in hand from post office red shorts and blue shirt."

Crowley Police Officer Jacob Landreneau ("Landreneau") overheard the radio transmissions from Habetz as he was patrolling nearby.  Landreneau testified that, after being informed that one of the suspects was wearing red shorts and a blue shirt, he saw the defendant, Clement, who was wearing clothes matching that description, as Clement was walking down a street about two blocks from the location of the abandoned vehicle. Clement was talking on his cell phone.

Landreneau stopped his vehicle in front of Clement, exited his vehicle, told Clement to hang up the phone and pointed his taser at Clement.  After holstering his taser, Landreneau patted Clement down for weapons, handcuffed Clement, and placed him in the back of his vehicle.  According to the dispatch log, Clement was detained by Landreneau at 9:53:52 a.m.  Landreneau then transported Clement back to the site of the abandoned vehicle where Habetz was waiting, two blocks north and half a block east of where Clement had been stopped.  Habetz then identified Clement as the person he saw pick up the package at the post office.

While Landreneau did not see Clement violating any laws after he located Clement, he testified that he knew Clement matched the description of a person Habetz was looking for who had fled a vehicle following a chase.  Accordingly, because he knew that Habetz was a narcotics officer, it was obvious to him why Habetz was pursuing Clement.

Habetz testified that he read Clement his *Miranda* rights, and asked where the package was.  Clement told Habetz that he had discarded the package and pointed in the general direction where he had abandoned the package.  When Landreneau saw Habetz leave Clement and the abandoned vehicle, he asked Habetz what he was doing.  In response, Habetz told Landreneau that Clement had told him where the package was. Habetz found the package behind a residence shortly thereafter, at 10:01:40 a.m., according to the dispatch log. When asked if Habetz was looking in more than one area for the package, Landreneau testified that Habetz "pretty much made an initial line to the general spot; no specific area, but to a general area."

Habetz testified that he then returned to Clement at the location of the abandoned vehicle and asked Clement about the contents of the package.  Clement admitted that the package contained marijuana.  Clement was then formally arrested.

Landreneau again read Clement his *Miranda* rights at 10:06:56 a.m. and transported Clement to the Crowley Police Department.  Clement arrived at the police station at

10:07:24 a.m.  Habetz stayed with the abandoned vehicle until a wrecker arrived.  Habetz testified that he saw a .380 [semi]automatic pistol on the passenger floorboard.

Habetz testified that he obtained Clement's cell phone from Landreneau at the site of the abandoned vehicle at about 9:53 a.m. and kept Clement's cell phone from that point on. For the reasons set out below, the Court finds this testimony to be untrue.

Landreneau could not confirm Habetz' testimony on this point, repeatedly testifying that he could not recall if he had secured the cell phone from Clement and placed it on the front seat of his vehicle or if Clement placed the cell phone back into his shorts pocket. Furthermore, although Landreneau initially testified that he believed Habetz acquired the phone shortly after he started talking to Clement at the scene, he later clarified that he could not say one way or the other whether Habetz had the phone before Landreneau transported Clement back to the police station; he simply did not know.

When he returned to the station, Habetz testified that, after obtaining a written signed *Miranda* rights waiver form from Clement, he began interrogating Clement.  The *Miranda* waiver form lists the time as 10:25 a.m.; Clement's signature on the form was witnessed by Habetz at 10:30 a.m. The *Miranda* waiver form provides that Clement was being questioned for various crimes, including possession with intent to distribute marijuana, resisting arrest by flight, obstruction of justice and illegal carrying of a firearm in the presence of a controlled substance. Although Habetz testified that the interrogation was recorded, he also testified that this recording was either lost or accidentally erased.

5

Initially, Habetz testified that before he interrogated Clement, he went to the courthouse to obtain a search warrant for the package, and that this took between fifteen and thirty minutes.  However, on cross examination, Habetz could not remember if he went to the courthouse to obtain the search warrant before or after he interrogated Clement.  Habetz explained that he obtained a search warrant for the box instead of asking for Clement's consent to open it because Clement had abandoned the box.

During questioning, Habetz testified that he asked Clement if there was anything illegal in the cell phone, such as numbers or messages from drug dealers.  Habetz then asked if he could look at the phone.  Habetz testified that Clement consented.  Because a special pass code was needed to access the contents of Clement's cell phone (a pattern drawn on a tic-tac-toe like diagram), Habetz asked Clement to unlock the phone so that he, Habetz, could access it.  Clement consented and unlocked the phone, stating that he had "nothing to hide."  Habetz thought that he had later drawn a diagram of the pattern needed to unlock the phone.  No consent-to-search form was executed for the search of the cell phone and no warrant was secured.

Habetz testified that he browsed through the phone and found a video that recorded black males sexually assaulting young girls.  One of the girls in the video was a 13 year-old girl that Habetz recognized from the Crowley area.  Habetz then stopped the search.  Because Habetz is a narcotics detective with no experience in child pornography cases, the child pornography investigation was turned over to FBI Agent Anne LaHaye ("LaHaye")

6

and Crowley Police Detective Deville ("Deville").  The cell phone was given to LaHaye, along with the diagram depicting the passcode pattern.  A search warrant for the cell phone was later obtained by Deville on September 23, 2011.

LaHaye confirmed that she received the cell phone and a drawing of a diagram of the passcode from Habetz.  According to LaHaye, both the cell phone and the diagram of the passcode pattern are currently in the possession of the forensic examiner, who had to use it to access the phone.  LaHaye further testified that she understood that Detective Habetz had obtained consent to search the phone.  However, in accordance with her experience and general practice,  a search warrant for the contents of the cell phone was nevertheless obtained.

The defendant Clement testified at the hearing. Clement's testimony as to when Habetz seized the phone and how Habetz got access to the contents of the cell phone directly contradicts the testimony of Habetz.  Clement testified that he was using his cell phone when he was stopped by Landreneau and he placed the cell phone in his pocket before he was put in handcuffs.  Accordingly, the cell phone was on his person, not in the possession of Habetz, until well after he arrived at the police station.

Clement further testified that after he was transported to the police station, he was handcuffed to a bench in the dispatch room.  At that time, the cell phone remained in Clement's pocket.   Since only one of Clement's hands was handcuffed to the bench and the other hand was left free, Clement used his free hand to access his cell phone and call

his mother two separate times, once at 10:09 a.m. and once at 10:17 a.m.  Clement's testimony on this point is corroborated by his AT&T cell phone records.  The cell phone records also reveal another call placed at 10:20 a.m. to a California number, which Clement admitted was the number of the person from whom he obtained the marijuana.

Clement further testified that Habetz took Clement to his office, advised him of his *Miranda* rights and questioned Clement.  During questioning, Clement testified that his cell phone remained in his pocket.  After he was questioned by Habetz in his office, Clement testified that Habetz went to the courthouse to get the search warrant for the package.  Accordingly, Clement was again brought back to the dispatch room where he was again handcuffed by one hand to the bench.

According to Clement, as he was using his cell phone, on Twitter, while handcuffed to the bench, Habetz entered the room and grabbed the phone from his hand.  Clement testified that he did not give Habetz permission to look through his phone, and that he did not show Habetz the passcode grid pattern to access the phone.  Rather, because the phone was already unlocked, Habetz began looking through it.  After seizing the cell phone, while Clement was still handcuffed to the bench, Habetz questioned Clement about the cell phone without first again reading Clement his *Miranda* rights.

Clement testified that he lied to Habetz about the location of the package, telling Habetz that he had thrown the package in a canal.  Clement further denied telling Habetz that the package contained marijuana.

Because Habetz's testimony as to when he acquired the cell phone is not corroborated by the testimony of Landreneau and is directly contradicted by Clement's cell phone records, which unequivocally demonstrate that Clement possessed the cell phone for at least twenty-five minutes after Habetz claimed he gained possession of it, the undersigned finds Detective Habetz's testimony on this point  not credible.

The Court finds it most probable that Habetz did not seize the cell phone from Clement until after Habetz returned from the courthouse after applying for the search warrant, as Clement testified.

## LAW AND ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.  *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967); *United States v. Garza*, 921 F.2d 59, 60 (5th Cir. 1991) *quoting United States v. Cisneros-Mireles*, 739 F.2d 1000, 1002 (5th Cir. 1984) *quoting Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

One of these exceptions is a search incident to a lawful arrest.  *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 854 (1973); *United States v. Milan*, 2447 Fed. Appx. 595, 596 (5th Cir. 2011) *citing  United States v. Curtis*, 635 F.3d 704, 711

(5th Cir.), *cert. denied*, ——— U.S. ———, 132 S.Ct. 191, 181 L.Ed.2d 99 (2011).  In order to justify a search as incident to an arrest, the arrest itself must have been lawful.  *See  Id.; United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973).  An arrest made in a public place without a warrant is valid if founded on probable cause.  *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *U.S. v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995).   Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *Wadley*, 59 F.3d at 512 *citing Harper v. Harris County*, 21 F.3d 597 (5th Cir. 1994).

        In the instant case, the first inquiry is whether Landreneau's initial seizure of Clement was constitutionally valid.  Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a law enforcement officer may briefly detain and frisk an individual, as long as the officer has a reasonable, articulable suspicion of criminal activity.  *United States v. Darensbourg,* 236 Fed.Appx. 991, 993-994 (5th Cir. 2007) (unpublished) *citing Terry*, 392 U.S. at 30; *United States v. Fontenette*, 2008 WL 4547507, *4 (W.D. La. 2008).

        When making a reasonable-suspicion determination, the Fifth Circuit has repeatedly stated that courts must look at the "totality of the circumstances" of each case. *Grant*, 349 F.3d at 197 (citations omitted); *United States v. Brigham,* 382 F.3d 500, 507

(5th Cir. 2004) (*en banc*).  Because the touchstone of Fourth Amendment analysis is reasonableness, the Fifth Circuit has rejected any "bright-line rules, instead emphasizing the fact-specific nature of the inquiry."  *Brigham,* 382 F.3d at 507.  Furthermore, reasonable suspicion may be based on the collective knowledge of the police. *United States v. Allison*, 616 F.2d 779, 782 (5th Cir. 1980); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759-760 (5th Cir. 1999);  *Fontenette*, 2008 WL 4547507 at *9.  Accordingly, personal knowledge of the specific facts which create reasonable suspicion is not required by each officer.  *Ibarra-Sanchez*, 199 F.3d at 759.

In the instant case, based on information received from the Louisiana State Police in early 2011, Habetz reasonably believed that narcotics was being shipped to Crowley from California and Michigan by United States mail and by Fed-Ex.  Habetz notified the Postmaster in Crowley of the investigation.  Prior to September 19, 2011, the Postmaster had notified Detective Habetz of the delivery of suspicious packages coming from California.  On September 19, 2011, the Postmaster contacted Habetz, telling him that numerous calls had been received from an unidentified person inquiring about the arrival of a package which was coming to Crowley from California.

While Habetz was conducting surveillance at the post office, the Postmaster called and gave Habetz a description of the black male who retrieved the package, advising that the subject was wearing red shorts and a blue shirt.  Habetz then saw this black male leave the post office, carrying a package, and enter the passenger side of a maroon vehicle.

Habetz followed the vehicle, observed the vehicle failing to stop at stop signs and then failing to pull over for these traffic violations when Habetz attempted to make a traffic stop, instead fleeing from the police in the vehicle and then on foot. Habetz then radioed the description of the fleeing men to other officers in the area seeking assistance.

Landreneau was informed via radio that Habetz was in pursuit of a fleeing vehicle and that the occupants had fled on foot in Landreneau's immediate patrol vicinity, with one of the occupants being described by Habetz as a thin-build black male wearing a blue shirt and red shorts.  Shortly after receiving and confirming the description of this suspect, Landreneau saw Clement who matched Habetz's description of a thin-build black male wearing a blue shirt and red shorts, walking in the immediate vicinity of the abandoned vehicle.  Landreneau, who knew that Habetz was a narcotics officer, then stopped Clement.

In sum, based on the information personally given to Habetz by the Louisiana State Police and the Postmaster, and Habetz' own observations, which, in part, were accurately transmitted  to Landreneau, there was reasonable suspicion to support the initial *Terry* stop of Clement.  Stated differently, Landreneau shared Habetz' reasonable suspicion, which entitled him to effectuate the seizure of Clement.

That does not end the Court's inquiry on the Constitutional validity of the *Terry* stop. The Supreme Court has long held that the "touchstone of Fourth Amendment analysis is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136

L.Ed.2d 347 (1996) *quoting Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803,

114 L.Ed.2d 297 (1991).  Accordingly, under *Terry*, the seizure of Clement must also have

been reasonable in both the methods employed and duration, so as not to convert the valid

seizure based on reasonable suspicion into an arrest for which there must be probable

cause.  As articulated by the Supreme Court in *Florida v. Royer*, 460 U.S. 491, 500, 103

S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983):

> The  predicate permitting seizures on suspicion short of probable cause is
> that law enforcement interests warrant a limited intrusion on the personal
> security of the suspect. The scope of the intrusion permitted will vary to
> some extent with the particular facts and circumstances of each case. This
> much, however, is clear: an investigative detention must be temporary and
> last no longer than is necessary to effectuate the purpose of the stop.
> Similarly, the investigative methods employed should be the least intrusive
> means reasonably available to verify or dispel the officer's suspicion in a
> short period of time.

Thus, an officer must pursue his investigation in a quick, diligent and reasonable

manner to either confirm or dispel his suspicion of criminal activity.  *Id*.; *United States v.

Sharpe*, 470 U.S. 675, 684-687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

Whether the police were unreasonable in failing to use less intrusive procedures to

conduct their investigation is determined on a case by case basis.  *United States v.

Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) *citing United States v. Sanders*, 994 F.2d 200,

206–207 (5th Cir. 1993).  A creative judge engaged in *post hoc* evaluation of police

conduct can almost always imagine some alternative means by which the objectives of the

police might have been accomplished. *Sharpe*, 470 U.S. at 686- 687.  However, the fact

that there may have been less intrusive means by which the objectives of the police might have been accomplished does not, in and of itself, render the stop unreasonable.  *Id.*, 470 U.S. at 687.

In this case, Landreneau, who was alone, pulled his vehicle directly into the path of the suspect, Clement, pointed his taser at Clement, patted Clement down for weapons, placed Clement in handcuffs and then placed Clement in the back of his police vehicle to transport him two blocks for identification and questioning by Habetz.

Using some force on a subject, pointing a weapon at a suspect and handcuffing a suspect, whether singly or in combination, does not automatically convert an investigatory detention into an arrest requiring probable cause.  *Campbell*, 178 F.3d at 349  *citing Sanders*, 994 F.2d at 206.  This is particularly the case when officers are investigating drug transactions where safety may be a concern, as drugs and firearms are commonly found in connection with each other. *See United States v. Majors*, 328 F.3d 791, 795 (5th Cir. 2003) ("[F]irearms are tools of the trade for those engaged in illegal drug activities." (internal citations and quotation marks omitted); *United States v. Coleman*, 969 F.2d 126, 132 fn. 20 (5th  Cir. 1992).

Moreover, handcuffing a defendant during a temporary detention does not convert a *Terry* stop to a full blown arrest.  *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000).  This is particularly the case when the suspected crime involves drugs, the suspect is a flight risk and where the defendant must be transported from one location to another.

*United States v. Bullock*, 632 F.3d 1004, 1016-1017 (7th Cir. 2011); *United States v. Estrada*, 459 F.3d 627, 634-635 and fn. 8 (5th Cir. 2006) (and cases cited therein); *see also Sanders*, 994 F.2d at 205-206 (and cases cited therein) (comparing cases on the appropriateness of handcuffing a defendant during a *Terry* stop).

Finally, transporting a defendant to a second location, while in handcuffs, does not automatically transform an investigatory detention into an arrest requiring probable cause. To the contrary, moving the defendant from the location of the stop to the scene of the crime may assist officers in dispelling or confirming their suspicions in a more expeditious fashion. *See United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (and cases cited therein).

Under the circumstances of this case, the methods employed by Landreneau were reasonable and, accordingly, did not transform the investigatory detention of Clement into a *de facto* arrest.  Clement was a fleeing suspect, reasonably believed to have been involved in a drug transaction.  Accordingly, he was potentially dangerous and an obvious flight risk.  Given that Clement was suspected of having been involved in a drug transaction, and further given that Landreneau was alone, Landreneau's handcuffing Clement was reasonable and justified for the safety of both Landreneau and Clement.

Finally, given that Habetz was only two blocks away, it was not unreasonable for Landreneau to transport Clement to Habetz' location for positive identification and further questioning.  Indeed, in this case, that action probably expedited the investigatory process

15

by allowing the officers to quickly confirm their suspicion that Clement was, in fact, the person involved in the suspected drug transaction.

Likewise, the length of time Clement was detained was reasonable and did not convert his valid seizure based on reasonable suspicion into a *de facto* arrest.  There is "no constitutional stopwatch", "bright line rule" or rigid time limitation on *Terry* stops. *Brigham,* 382 F.3d at 511; *Sharpe*, 470 U.S. at 685; *Fontenette*, 2008 WL 4547507 at *8. The relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  *Brigham,* 382 F.3d at 511(citations omitted); *Fontenette*, 2008 WL 4547507 at *8; *Sharpe*, 470 U.S. at 686.  However, "once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion." *Fontenette*, 2008 WL 4547507 at *8 *citing Grant,* 349 F.3d at 197.

The testimony of both Landreneau and Habetz confirm that only a few minutes elapsed between the time that Clement was initially detained and the time that he admitted the package he had abandoned contained marijuana, at which time probable cause to arrest Clement clearly existed.  The dispatch log corroborates this testimony.  The log indicates that Clement was initially detained by Landreneau at 9:53:52 a.m., and that the package had been recovered by Habetz and its contents disclosed by Clement, before Clement arrived at the police station at 10:07:24 a.m., less than fifteen minutes later.

16

Given the circumstances known to the officers, the Court concludes that the investigation was pursued in a diligent and reasonable manner.  Indeed, it is difficult for the Court to envision that this investigation could have been handled more expeditiously. Furthermore, this short amount of time is considerably less than that in other cases in which the delay has been held to have been reasonable under the circumstances. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575 (1985) (20 minute delay);  *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (29 minutes); *United States v. Padilla*, 233 F.3d 575, 2000 WL 1468728 (5th Cir. 2000) (45 minute delay)*; United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987) (50 minute delay).

Clement argues that because Habetz' testimony as to when he, Habetz, secured Clement's cell phone is false, the Court should likewise not accept Habetz' testimony that, while still at the location of the abandoned vehicle, after being orally given his *Miranda* rights, Clement told Habetz where the package was located and that the package contained marijuana. The Court rejects this argument.  Unlike Habetz' testimony regarding when he secured the cell phone, Habetz' testimony regarding Clement's statements advising of the location and contents of the package, was corroborated.

Landreneau, whose testimony the Court finds entirely credible, testified that when he saw Habetz leave Clement at the abandoned vehicle, he asked Habetz what he was doing.  In response, Habetz told Landreneau that Clement had told him where the package was located.  Moreover, Landreneau testified that Habetz "pretty much made an initial line

to the general spot; no specific area, but to a general area" where the package was found. Absent Clement telling Habetz where the package had been abandoned, it is unlikely that Habetz would have been able to proceed directly to the area where the package was found and to immediately retrieve it.

Habetz' testimony on this point is further corroborated by the radio log.  The package was discovered by Habetz at 10:01:40 a.m., just minutes after Clement had been detained and brought to Habetz for questioning.  It is unlikely that the package would have been found so quickly had Clement not provided its location.

Moreover, the speed with which the package was recovered undermines Clement's testimony on this point.  Had Clement lied to Habetz and told him that the package was in the canal, as he testified, it would not have been possible for Habetz to have recovered the package as quickly as he did.

Habetz' testimony that Clement confessed that the package contained marijuana is corroborated by the written *Miranda* waiver form which was completed between 10:25 and 10:30 a.m.  That form specifically indicates that Clement was to be questioned for possession with intent to distribute "*marijuana*". (emphasis added)  If Clement had not told Habetz what was in the package, Habetz would not have been able to accurately list the specific drug which he believed was being transported – marijuana.[1]

---

[1] The drug trafficking of which Habetz was made aware by Guilbeau was not limited solely to marijuana, but rather involved two drugs – Promethazine syrup and marijuana.  The package seized in April 2011 contained only promethazine syrup.  Accordingly, if Habetz had not previously been told by Clement that the package contained marijuana, he would not have been able to place that information on the *Miranda* waiver form.

For these reasons, despite Habetz' testimony regarding his seizure of Clement's cell phone, the Court accepts Habetz' testimony that, while at the scene of the abandoned vehicle, Clement told him where the package was and also told him that the package contained marijuana. At that point, prior to his being transported to the Crowley Police Department by Landreneau, there was probable cause to lawfully arrest Clement, ending the investigatory detention.

In sum, the seizure of Clement was constitutionally permissible because the seizure was supported by reasonable suspicion that criminal activity was afoot and was reasonably effected and limited to a reasonably short period of  time during which the officers verified their suspicion. Furthermore, it is clear that Clement's arrest, following his confession that the package contained marijuana, was lawful, as the arrest was founded on probable cause. *See United States v. Watson*, *supra.*  The totality of facts and circumstances at that point were more than sufficient for the officers to conclude that Clement had committed a drug trafficking offense.

The final issue which the Court must determine is whether the search of Clement's cell phone by Habetz, without a warrant, was constitutionally permissible.  For the reasons which follow, the Court concludes that it was.

While there was contradictory testimony as to how Habetz gained access to the cell phone to search its contents, that is, whether or not Clement voluntarily consented to the search, the Court need not resolve that factual dispute.  Under binding Fifth Circuit

precedent, Habetz was entitled to search the contents of Clement's cell phone, even without his consent and without a warrant, as incident to a lawful arrest.

The Fifth Circuit has repeatedly held that law enforcement officers may conduct a warrantless search of the contents of a suspect's cell phone, which is in the suspect's immediate control, incident to his lawful arrest.  *United States v. Finley*, 477 F.3d 250, 260 (5th Cir. Tex. 2007); *United States v. Curtis*, 635 F.3d 704, 712-713 (5th Cir. 2011); *United States v. Butler*, 2012 WL 1819015, *4 (5th Cir. 2012) (unpublished).

In *Finley*, the defendant was arrested for drug possession following a search of the defendant's vehicle during a traffic stop.  The defendant's cell phone was seized from his pocket.  The police then transported the defendant to a different location for questioning.  During the questioning, an officer scrolled through the text messages on the defendant's cell phone, without first obtaining a warrant.  The officer discovered some incriminating text messages that were admitted against the defendant at trial.  *Id*. at 254.

The Fifth Circuit concluded that the warrantless search of the cell phone's contents was incident to the defendant's arrest, and no warrant to search the cell phone contents was therefore necessary.  Accordingly, the Fifth Circuit affirmed the lower court's decision not to suppress the text messages.  *Id.* at 259-260.  Furthermore, the Fifth Circuit found that the fact that the search took place after the police transported the defendant to a different location for questioning did not invalidate the lawfulness of the search because "searches

and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *Id*. at fn. 7.

The Fourth, Seventh, and Tenth Circuits have reached the same conclusion on similar facts. *Curtis,* 635 F.3d at 712 *citing United States v. Murphy*, 552 F.3d 405, 410 (4th Cir. 2009), *cert. denied*, —— U.S. ——, 129 S.Ct. 2016, 173 L.Ed.2d 1109 (2009); *United States v. Young*, 278 Fed.Appx. 242, 245 (4th Cir. 2008) (*per curiam*) (unpublished), *United States v. Pineda–Areola*, 372 Fed.Appx. 661, 663 (7th Cir. 2010) (unpublished); *United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996); *Silvan W. v. Briggs*, 309 Fed.Appx. 216, 225 (10th Cir. 2009) (unpublished).

*Finley* forecloses Clement's argument that this Court should suppress the video recovered from his cell phone.  This Court has concluded that Clement's investigative detention and subsequent arrest were lawful.  The evidence demonstrates that the cell phone was on his person and within Clement's immediate control upon his arrest, and it is undisputed that the search of the cell phone occurred while Clement was still being processed at the police station.[2]  Accordingly, the warrantless search of Clement's cell phone was permissible because it was incident to Clement's lawful arrest.  There is therefore no basis for suppression of the video or other evidence recovered as a result of that search.

---

[2]The Acadia Parish Sheriff's Department arrest report, generated upon Clement's booking, was completed at 4:53 p.m.  Accordingly, Detective Habetz testified that the cell phone search occurred sometime between 10:10 a.m. and 4:00 p.m.

For the above reasons, **IT IS RECOMMENDED** that the defendant's Motion to Suppress [rec. doc. 32] be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

THUS DONE AND SIGNED in Lafayette, Louisiana, October 11, 2012

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

22